**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Chad Scott Lawrence,

               Plaintiff,

v.

Joesph Bendel, et al.,

              Defendants.

No. CV-24-03311-PHX-DWL

**ORDER**

This is a *pro se* prisoner civil rights action in which Defendants filed a notice of settlement. (Doc. 52.) Afterward, Plaintiff filed a motion for reinstatement (Doc. 55) and Defendants filed a motion to enforce settlement (Doc. 57). For the reasons that follow, the former is denied and the latter is granted.

## BACKGROUND

The following facts are not in dispute.

On August 1, 2025, Plaintiff emailed defense counsel an offer to "dismiss all defendants for a financial sum of $250 per defendant, totaling $1,000." (Doc. 57-1 at 2-3.)

On August 4, 2025, defense counsel responded: "I have heard back from risk management. I am authorized to offer you $750. That would necessitate a signed release, with no admission of any culpability on the part of any of the defendants, and dismissal of this lawsuit with prejudice." (*Id.* at 5.)

On August 7, 2025, Plaintiff replied: "I will accept that offer, but I don't know how

to end the lawsuit…my book doesn't cover that part!  Can you draw up the paperwork to finalize all of this?"  (*Id.* at 7.)

On August 14, 2025, defense counsel responded: "I am glad we were able to get this resolved.  Yes, I will prepare a draft Release of All Claims and Settlement Agreement, as well as a draft Stipulation to Dismiss with Prejudice, for your review.  Once the Release is signed, and you give me the authority to file the Stipulation to Dismiss, I will be able to send you the settlement check."  (*Id.* at 9.)  Later that day, defense counsel sent another email stating that the risk manager needed Plaintiff's social security number and date of birth to issue the payment and clarifying that instead of sending a settlement check, the risk manager would process a payment that would go directly into Plaintiff's "IM account."  (*Id.* at 12.)

On August 19, 2025, Plaintiff emailed his social security number and date of birth[1] to defense counsel.  (*Id.* at 15.)

On August 22, 2025, Plaintiff emailed defense counsel that he was being "sent to a much more dangerous prison" in retaliation for his "grievances and lawsuit" and would not sign the settlement agreement unless he was "transferred back to South Unit."  (Doc. 59 at 7.)

On September 15, 2025, Plaintiff again emailed defense counsel, stating: "I am sorry we are not able to resolve this matter as we were expecting, but this retaliatory transfer has caused me to lose my job, suffer additional physical harm from staff misconduct, and a lot of my property was stolen . . . I will address these issues in a separate lawsuit because I don't believe your clients were directly involved, but I still feel that a $750 settlement is insufficient to resolve the harm your clients have caused me."  (*Id.* at 9.)

On October 28, 2025, Magistrate Judge Morrissey, to whom this case was referred, issued an order noting that the matter appeared ready for trial and withdrawing the reference.  (Doc.  51.)

---

[1]    This sensitive information should have been redacted.  The Court will direct the Clerk to seal the exhibit at Doc. 57-1.

On November 4, 2025, Defendants filed a notice of settlement (Doc. 52), and the following day, the Court vacated all pending deadlines and ordered the Clerk to dismiss this case and enter judgment on January 5, 2026, unless a party filed a request to reinstate the case on the Court's trial calendar (Doc. 54).

On November 6, 2025, Plaintiff filed a motion to reinstate the case, which states that Plaintiff "has NOT settled this case with any party in this matter, and has no intention to submit any stipulations to dismiss to the Court." (Doc. 55.)

On November 10, 2025, Defendants filed a response opposing the motion for reinstatement (Doc 56) and a motion to enforce settlement (Doc. 57).

On November 18, 2025, Plaintiff filed a response opposing Defendants' motion to enforce settlement (Doc. 59) and a motion for sanctions (Doc. 58).

On November 21, 2025, the Court denied the motion for sanctions. (Doc. 60.)

On November 25, 2025, Defendants filed a reply in support of their motion to enforce settlement. (Doc. 61.)

## DISCUSSION

I.    <u>Motion To Enforce</u>

Plaintiff's motion for reinstatement is three sentences long and cites no legal authority (Doc. 55), Defendants' response thereto requests that the Court consider the motion to enforce settlement before considering the motion for reinstatement because granting the motion to enforce settlement would render the motion for reinstatement moot (Doc. 56), and no reply in support of the reinstatement motion was filed. Thus, the analysis begins with the motion to enforce the settlement.

A.    **The Parties' Arguments**

The motion to enforce the settlement summarizes the parties' discussions (Doc. 57 at 1-3), attaches emails between Plaintiff and Defendants as exhibits (Doc. 57-1), and asks the Court to "enforce the written settlement agreement between the parties by, (1) denying Plaintiff's Motion to Reinstate this case on the Court's active calendar, (2) ordering the Plaintiff to sign an appropriate Release of All Claims document, and (3) entering an Order

of Dismissal with Prejudice in this matter." (Doc. 57 at 4.)

Plaintiff responds that "no binding settlement was ever formed" because Plaintiff "never received any draft 'Release of All Claims' or any written settlement terms from Defendants" and "never reviewed, signed, or agreed to any written settlement terms" and "expressly withdrew any willingness to settle on [August 22, 2025] and again on [September 15, 2025], before any documents were exchanged or executed." (Doc. 59 at 1-2.) Plaintiff asserts that "[w]ithout written terms, without signatures, and without mutual assent to material conditions, there was no enforceable agreement." (*Id.* at 2.) Plaintiff further asserts that his email stating he did "not know how to end the lawsuit" and asking defense counsel to draft the notice of settlement demonstrates that his acceptance "was conditional." (*Id.* at 3.) Finally, Plaintiff asserts there was no "meeting of the minds" because he "never received the agreement and never saw the terms," which demonstrates that the parties could never have agreed upon "the release terms, the dismissal terms, the payment conditions, all material provisions." (*Id.* at 5.)

In reply, Defendants assert that the parties' emails contain all of the elements of a valid contract—"an offer, acceptance, consideration, and a sufficiently specific statement of the parties' obligations"—and establish that a binding settlement agreement was reached. (Doc. 61 at 2-4.) Defendants further assert that "Plaintiff's argument that there was no binding settlement of his case because there was no 'meeting of the minds' is simply untrue" and "is grounded in a fundamental misunderstanding of the law," because "[t]he signing of the Release is not the settlement contract itself, but simply a term of the settlement contract." (*Id.*) Defendants argue that "Plaintiff's acceptance was not conditional," noting that "Plaintiff has not argued that there were any oral representations relevant to the settlement negotiations" and the emails contain a clear acceptance with "no condition that Defendants must meet prior to Plaintiff accepting Defendant's offer." (*Id.* at 4.) Finally, Defendants argue that Plaintiff's request that Defendants take the necessary steps "to end the lawsuit" and his subsequent act of providing his social security number and date of birth "so that the settlement payment could be deposited into his inmate

account" "further manifest his assent (and intent) to resolve the case." (*Id.* at 5.)

**B.    No Need For Evidentiary Hearing**

"It is now well established that the trial court has power to summarily enforce on motion a settlement agreement entered into by the litigants while the litigation is pending before it." *In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994). "Like many rules of thumb, this well-settled practice has limits. Summary enforcement is ill-suited to situations presenting complex factual issues related either to the formation or the consummation of the settlement contract, which only testimonial exploration in a more plenary proceeding is apt to satisfactorily resolve. Accordingly, . . . enforcement upon motion [is] inappropriate where material facts concerning the existence or terms of a settlement [are] in dispute, or where a settlement agreement was apparently procured by fraud." *Id.* (cleaned up). *See also Doi v. Halekulani Corp.*, 276 F.3d 1131, 1133-34 (9th Cir. 2002) (concluding that "the district court correctly enforced a negotiated settlement without holding an evidentiary hearing where, after the terms were placed on the record and agreed to by all parties in open court, the plaintiff refused to execute a written agreement").

Here, summary disposition without an evidentiary hearing is appropriate. The parties' recent submissions establish that all of the parties' settlement-related communications were via email[2] and those emails have now been provided to the Court. No party has disputed the authenticity of the emails. Thus, there is no possibility of a dispute over the "material facts" concerning the existence or terms of the purported settlement. Indeed, the only possible additional information that could be provided during an evidentiary hearing is the parties' testimony about their intent in sending the emails in question, but such testimony would not be material or relevant in determining whether an enforcement settlement agreement was formed. *See, e.g., Hill-Shafer P'ship v. Chilson Family Trust*, 799 P.2d 810, 815 (Ariz. 1990) ("[M]utual assent [must be] based on objective evidence, not on the hidden intent of the parties."); *Helena Chemical Co. v. Coury*

---

[2]    Presumably, this was due to the fact that Plaintiff was (and is) incarcerated.

*Bros. Ranches, Inc.*, 616 P.2d 908, 913 (Ariz. Ct. App. 1980) ("That courts should not be concerned with the undisclosed intent of the parties is made crystal-clear by a long line of decisions of our Supreme Court . . . .") (cleaned up); *Franklin Life Ins. Co. v. Mast*, 435 F.2d 1038, 1045 (9th Cir. 1970) ("Assuming, arguendo, then, that Mast did have a secret intent or motive, this would not prevent an enforceable contract from emerging."). Furthermore, the parties have not requested an evidentiary hearing. Both of these details distinguish this case from the type of situation in which an evidentiary hearing is required. *Callie v. Near*, 829 F.2d 888, 889-90 (9th Cir. 1987) (concluding that the district court erred by "enforc[ing] a purported settlement agreement without first holding an evidentiary hearing to determine the existence and terms of the agreement" where one side "requested an evidentiary hearing, contending that two material factual issues regarding the validity and scope of the settlement agreement were in dispute" and where one of those issues concerned whether a particular issue "was an important focus of the negotiations," which one side hoped to establish by calling, as a witness, "a securities counsel . . . who was involved in the settlement negotiations [who] could be called to clarify this issue").

### C.    Contract Formation

State contract law governs whether the parties reached an enforceable agreement. *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014).

####    1.    Arizona Contract Law

"To establish a binding settlement agreement, [a party] must establish all elements of a valid contract," which are "an offer, acceptance, consideration, a sufficiently specific statement of the parties' obligations, and mutual assent." *Muchesko v. Muchesko*, 955 P.2d 21, 24 (Ariz. Ct. App. 1997). "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* (cleaned up). "[A]cceptance is a manifestation of assent to the terms thereof made by the offeree in a manner invited[3] or required by the

---

[3]    An offer may be extended and accepted via email. *See, e.g.*, *Robertson v. Alling*, 351 P.3d 352, 354 (Ariz. 2015) ("Sifferman sent that attorney an email extending a new settlement offer with terms that mirrored the prior offer but would expire at 5:00 p.m. on

offer." *Id.* at 25 (cleaned up). The requirement of consideration is satisfied when each party has "a legal benefit and a legal detriment accrue to it," including where there is "a promise for a promise." *Tucson Fed. Sav. & Loan Ass'n v. Aetna Inv. Corp.*, 245 P.2d 423, 427 (Ariz. 1952). "To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if sought or given in exchange for the promise of the other party." *Schade v. Diethrich*, 760 P.2d 1050, 1057 (Ariz. 1988).

"[B]efore a binding contract is formed, the parties must mutually consent to all material terms." *Hill-Shafer P'ship*, 799 P.2d at 814. "[M]utual assent is based on objective evidence, not on the hidden intent of the parties. In other words, what is operative is the objective manifestations of assent by the parties. . . . [A] contract is formed if there is manifestation of mutual assent to the exchange and a consideration." *Id.* at 815. "The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance. But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. *In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.*" *Schade*, 760 P.2d at 1058 (cleaned up). "The fact that one of the parties, *with the knowledge and approval of the other,* has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby." *Id.* at 1059.

"[A] contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof. If all the conditions of the postponed writing are specified in such agreement, it is an agreement In praesenti, and as such becomes immediately enforceable. But where the conditions of the deferred contract are not set out in the provisional one, or where material conditions are omitted, it is not a contract In praesenti because the minds of the parties have not met

---

February 8. Grasso timely accepted the offer via email.").

1    and may never meet." *Chu v. Ronstadt*, 498 P.2d 560, 563 (Ariz. Ct. App. 1972).

2                    2.    Analysis

3           Defense counsel's August 4, 2025 email was clearly an offer: "I am authorized to
4    offer you $750.   That would necessitate a signed release, with no admission of any
5    culpability on the part of any of the defendants, and dismissal of this lawsuit with
6    prejudice." (Doc. 57-1 at 5.)  This offer also contemplated an exchange backed by adequate
7    consideration—a payment of money in return for "a signed release" and the dismissal of
8    the lawsuit with prejudice.

9           Defendants appear to take it for granted that Plaintiff's August 7, 2025 email
10    accepted that offer, stating that "Plaintiff's email response on August 7, 2025, accepts the
11    settlement offer, in no uncertain terms," quoting and italicizing the portion of the email that
12    states, "*I will accept that offer*," and adding that "Plaintiff's emailed assent in the instant
13    case (i.e. 'I will accept that offer') is at least as clear, if not more so," than a statement in
14    *Nesbitt v. City of Bullhead City*, 2020 WL 6262396 (D. Ariz. 2020), in which an email
15    included the words "We accept."  (Doc. 61 at 3.)  Plaintiff, for his part, states that his
16    August 7, 2025 email "said that he was willing to accept the number" but emphasizes that
17    he added "but I do not know how to end the lawsuit" and then "asked the attorney to draft
18    paperwork."  (Doc. 59 at 3.)  According to Plaintiff, "[t]his is not a final acceptance"
19    because it showed that he "understood more steps were required."  (*Id.*)

20           Although neither side mentions this in their briefs, the Court notes that the Plaintiff's
21    August 7, 2025 statement regarding accepting the offer was phrased using the future tense:
22    "I *will* accept that offer," rather than "I accept that offer."  Perhaps the reason the parties
23    overlooked this verb tense is due to an idiosyncrasy of the English language: the phrase "I
24    will agree" is sometime used to denote present agreement.  For example, in *Garity v.*
25    *Donahoe*, 2014 WL 4402499 (D. Nev. 2014), the district court recounted a colloquy in
26    which a litigant stated that a one-day medical exam "would be preferable" but then added,
27    "I will agree to the two days" and characterized this exchange as completed agreement:
28    "Plaintiff expressly agreed . . . to the manner, conditions, and scope of the examination."

*Id.* at *3.  *See also Snow v. Beard*, 162 P. 258, 260 (Or. 1917) ("In his reply of July 26, 1913, Roscoe wrote Mr. McCamant in part as follows: 'After carefully considering your proposition I am constrained to say that *I will agree* to a settlement on the terms as outlined in your letter.  *I do this* reluctantly.'") (emphases added); *People v. Sequeira*, 2020 WL 3969802, *7 (Cal. Ct. App. 2020) ("The trial court asked whether defendant had anything to add. Defendant responded: 'As [my current attorney] said—I agree wholly with what he said, and *I will agree* with him *at this time*.'") (emphases added).

Nevertheless, despite Plaintiff's failure to explicitly raise the argument that the verb tense of "will accept" indicates future agreement, and notwithstanding the linguistic ambiguity described in the previous paragraph, the Court will consider the words "I will accept that offer" to indicate future acceptance—in other words, to be a promise to accept the offer later, or an agreement to make an agreement.

"[A]n agreement to make an agreement" is "usually provisional or temporary; it being the intention at some later date to set out in a more formal way the terms and conditions of the proposed agreement.  If all the conditions of the postponed agreement are specified in such agreement, it is an agreement in praesenti.  But where the conditions of the deferred contract are not set cut in the provisional one, or where material conditions are omitted, it is not a contract in praesenti, because the minds have not met and may never meet.  To be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations."  *Peer v. Hughes*, 213 P. 691, 691 (Ariz. 1923) (cleaned up).

In *Peer*, there were many conditions of the postponed agreement that had not been specified in the agreement to agree:

> According to the agreement made the basis of this suit, defendant, Peer, bound himself to pay plaintiff, Hughes, $25,000 cash and 75,000 shares of stock in mining companies to be organized by Peer; to put two men at preliminary development on or before February 10th; to employ not less than four men in actual work on or before March 15, 1916, and to forfeit his contract if, for any cause except causes beyond his power to control, work ceased for longer than 30 consecutive days.  In return for all these promises he got the agreement of Hughes 'to bond and lease the group of claims known as the Bobbie Burns group.'  There is no specification as to the conditions of the bond or lease he agreed to execute, no provision as to when or how, if at

all he will convey the title of mining claims to Peer, and none as to when lease shall begin or terminate, or the rights and privileges of lessee to explore and prospect for ore bodies, or the disposition of improvements in the way of machinery, mills, trackage, tools, or minerals extracted—provisions usual and common to bonds and leases of mining claims. These details that necessarily enter into options or conditional mining deals were not inserted in the provisional agreement, and were left at large in suspense, to be settled in the final negotiations and included in the 'bond and lease.'

*Id.* at 692. Because there were essential "terms and conditions . . . left open to further negotiations," the agreement to agree was "not a contract" but was rather "an agreement to make a contract in the future." *Id. See also Chu*, 498 P.2d at 564 ("The last paragraph of the July 7th letter, coupled with the limited terms agreed upon in the letter, clearly shows that the parties intended to settle other pertinent and important terms of the lease agreement sometime in the future. The parties to the alleged lease contract did not agree as to the starting date of the lease, or the method of payment (one of the most important aspects) and furthermore, the letter of July 7th is not sufficient to permit the court to establish the rights and duties of the parties respecting the purported lease contract. If any doubt remains as to the sufficiency of terms for a lease contract, the last paragraph of the July 7th letter together with finding of fact number five, clearly show that finalization of the contract depended upon inspection by a third party. The insufficiency of the terms for a lease contract, the objective intention of the parties to agree on terms at a future date, and the dependence of the contract upon inspection by a third party are the compelling reasons why we conclude that no enforceable lease contract resulted from the letter of July 7th.").

However, when there are no essential terms and conditions left open to further negotiations, an agreement to agree is a contract, as binding as any other contract. In *T. D. Dennis Builder, Inc. v. Goff*, 418 P.2d 367 (Ariz. 1966), the parties entered into an escrow agreement in which they agreed that "property will be conveyed . . . and a Trust agreement entered into." *Id.* at 369. The escrow agreement "set out the terms of the trust agreement to be executed in the future 'for the purposes of consummating a sale and for the purpose of permitting trustor at his option to subdivide said property.'" *Id.* The parties exchanged "several proposed trust agreements" but "never executed" a trust agreement, and the trial

court concluded that "no contract existed between the parties." *Id.* The Arizona Supreme Court disagreed and held that "a contract does exist as a matter of law," reiterating that "an agreement to make an agreement is not an enforcible [sic] contract when it does not set forth all the essential elements of the future contract" but noting that "in the case at bar, nothing essential is left for future negotiation." *Id.* at 370. The Court differentiated between stated terms of the bargain, which would need to be fulfilled to carry out an already-existing contract, and statements that would make the contract binding only upon fulfillment of a condition: "The execution of the trust agreement in the future, containing the terms found in the supplemental escrow instructions, was merely a convenient means of carrying out the existing contract between the parties. If the parties wished to make their contract conditional upon the execution of the trust agreement, then it was incumbent upon them so to state. This court is loath to imply conditions into contracts which either make or break them." *Id.*

These general contract principles apply to settlement agreements. A review of Arizona cases confirms that parties must "state" their intention to make settlement agreements conditional and that courts will not "imply conditions into" settlement agreements. As such, if the evidence demonstrates that at least one of the parties clearly stated an intention to be bound only upon the signing of certain papers, then that intention will govern and the agreement will not be binding unless and until said papers are signed. For example, in *Eli v. Procaccianti AZ II, LP*, 2024 WL 3341285 (Ariz. Ct. App. 2024), the defendants "explicitly stated" in an email that "*until there is a final signed fully executed settlement agreement, there is no settlement between the parties*." *Id.* at *5 (emphasis added). When two days later, the defendants emailed proposed settlement terms, the email included the caveat that the proposed terms were "subject to a suitable settlement agreement." *Id.* Because the correspondence between the parties indicated that the defendants did not intend to be bound until there was a "final signed fully executed settlement agreement," the emails between the parties were not sufficient to bind the parties. *Id.*

In contrast, in the absence of a clear statement that the parties will be bound only upon the signing of certain papers, Arizona courts will not infer that condition into the agreement.  For example, in *Hays v. Fischer*, 777 P.2d 222 (Ariz. Ct. App. 1989), after months of settlement discussions and various rejected settlement offers, defense counsel sent a letter ("the January 27, 1987 letter") to the plaintiff's counsel offering "to settle the liability portion of this case" for $10,000, an offer that was stated to be "obviously contingent upon receiving a full release from your client, along with a dismissal of the present lawsuit, with prejudice."  *Id.* at 223.  The plaintiff made a counteroffer of $11,586.75, which was rejected, and on February 4, 1987, defense counsel offered to pay $10,500.  *Id.* at 224.  The plaintiff had authorized her attorney to accept an offer of that amount, which he did, on February 5, 1987.  *Id.*[4]  On February 18, 1987, defense counsel sent a letter confirming that the parties (via their counsel) had agreed "that the lawsuit in this case will be disposed of by way of a Stipulation and Order for Dismissal with Prejudice" and promising to send the stipulation.  *Id.* at 225.  However, by that point, the plaintiff "was having more medical problems and did not want to proceed with the settlement."  *Id.*  She retained new counsel and refused to sign the stipulation to dismiss the case or execute the release.  *Id.*  Defense counsel filed a motion to enforce the settlement, which the trial court granted.  *Id.*  On appeal, the plaintiff argued, *inter alia*,[5] that the January 27, 1987 letter "made settlement 'contingent' on [the defendant's] receipt of a full release and dismissal of [the plaintiff's] lawsuit with prejudice."  *Id.* at 226.  The Arizona Court of Appeals rejected this argument, stating that it did "not interpret [the January 27, 1987 letter] as inviting a settlement agreement that would not bind either party until fully 'consummated.'"  *Id.*  Although the January 27, 1987 letter had stated that the offer to settle the liability portion of the case was "obviously contingent upon" a release

---

[4]    The "liability portion" offer was in addition to the agreed-upon payment of medical bills, which originally totaled $3,413.25, but then the plaintiff's attorney "found there was an additional bill for $270 that he did not know about which had not been included in the $3,413.25 figure," such that the February 5, 1987 acceptance was subject to paying that additional medical bill.  777 P.2d at 224.

[5]    Other arguments involved whether the plaintiff's attorney had the authority to settle on her behalf, an issue not relevant here.

and dismissal with prejudice, the court rejected the notion that these words created a condition that needed to be met before the offer could be accepted, instead interpreting them as a statement of contractual obligations: "The execution of the release and stipulation was not a condition precedent to the settlement agreement, but was an obligation [the plaintiff] undertook when she entered into the settlement through [her counsel]." *Id.*[6]

Here, the parties' August 4, 2025 and August 7, 2025 emails created a binding agreement to make an agreement because "nothing essential [was] left for future negotiation," *Goff*, 418 P.2d at 370, and the emails did not "explicitly state[]" that the agreement would not be binding until the release and stipulation of dismissal were signed. *Eli*, 2024 WL 3341285 at *5. Defense counsel's August 4, 2025 email set forth an offer containing the parties' obligations—Defendants would remit $750 to Plaintiff, and Plaintiff would provide "a signed release, with no admission of any culpability on the part of any of the defendants, and dismissal of this lawsuit with prejudice"—and Plaintiff's August 7, 2025 email agreed to accept that offer and asked defense counsel to "draw up the paperwork to finalize all of this." Plaintiff has not identified any essential term that was left open to be decided later. Plaintiff states that the "material terms of the agreement— release language, scope of release, admissions, payment conditions, and dismissal—were never presented to [him]." (Doc. 59 at 4.) But this merely begs the question and fails to

---

[6] Arizona case law may differ from the case law of other jurisdictions as to whether words such as "contingent upon," without more explicit statements of intention, necessarily create a condition precedent to formation of the contract as opposed to setting forth contractual obligations. *Cf. Golding v. Floyd*, 539 S.E.2d 735, 737 (Va. 2001) ("[W]here you have a proposal or agreement made in writing expressed to be subject to a formal contract being prepared, it means what it says; it is subject to and dependent upon a formal contract being prepared."). At any rate, the parties did not use words such as "contingent upon" or "subject to," nor is there any other "plain, clear, and unambiguous language" creating any conditions precedent to the formation of the agreement. *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1043 (9th Cir. 2020) ("There are two species of conditions precedent: conditions precedent to *formation* and conditions precedent to *performance*. Essentially, where a condition precedent to formation is not satisfied, the proposed bargain between the parties does not become a binding contract. Indeed, even where the contract is complete and signed, it may be shown that the parties orally agreed that it should not become binding until the happening of some event. Conversely, if a condition precedent to *performance* fails, the parties still have a contract, but they lose the right to enforce at least some of its terms. Courts will neither infer nor construe a condition precedent absent language plainly requiring such construction. Conditions precedent must be expressed in plain, clear, and unambiguous language, but parties need not invoke any required magical incantation.") (cleaned up).

identify any essential material term missing from the original agreement to make an agreement. There is no reason to believe the "release language" containing the "scope of release," had it been drafted and presented to Plaintiff, would differ in some way from the offer, which states that there would be a release with "no admission of any culpability on the part of any of the defendants" and contains no limiting language suggesting the scope would be anything other than a release of all claims against all defendants. As for "admissions," the offer was clear—there would be none. As for "dismissal," the offer was clear—it would be with prejudice. And as for payment conditions, Plaintiff has not identified any disagreement between the parties regarding payment conditions, nor has he advanced any argument regarding why any particular detail regarding remitting payment would be an essential material term. *See generally Res. Recovery Corp. v. Inductance Energy Corp.*, 2021 WL 2334395, *1-4 (D. Ariz. 2021) (analyzing whether a material term that was not included in the agreement was an "essential term").

Plaintiff characterizes his request that defense counsel "draw up the paperwork" as indicative that he "understood more steps were required." (Doc. 59 at 3.) Plaintiff's understanding was not wrong—more steps were (and are) required—but those steps were required to *perform* the contract, not to *form* it. To the extent Plaintiff asks the Court to imply a condition precedent to formation into the parties' agreement from the parties' references to the release and stipulation of dismissal that Plaintiff agreed to sign, the Court is not at liberty to do so. *Goff*, 418 P.2d at 370 ("If the parties wished to make their contract conditional upon the execution of [a future document], then it was incumbent upon them so to state. This court is loath to imply conditions into contracts which either make or break them."); *Hays*, 777 P.2d at 226 ("The execution of the release and stipulation was not a condition precedent to the settlement agreement, but was an obligation [the plaintiff] undertook when she entered into the settlement through [the defendant].").

Defendants assert that after the August 4, 2025 and August 7, 2025 email exchange, Plaintiff's "subsequent actions were in conformance with a belief that he had settled his case," noting that he asked for assistance to end the lawsuit and provided defense counsel

with his social security number and his date of birth, "so that the settlement payment could be deposited into his inmate account," noting that "[t]here was no reason" for Plaintiff to do this "unless he intended to settle the case." (Doc. 60 at 5.) Although the Court tends to agree with Defendants' assertions, there is no need to go down this analytical path, as the August 4, 2025 and August 7, 2025 email exchange was alone sufficient to demonstrate that the parties formed a binding agreement to make an agreement. Plaintiff's subjective belief does not enter into the legal analysis. *Hill-Shafer P'ship*, 799 P.2d at 815 ("[M]utual assent is based on objective evidence, not on the hidden intent of the parties.").

A final loose end is Plaintiff's stated reasons for deciding not to proceed with the settlement. Plaintiff asserts that he is dissatisfied with his recent transfer to a new prison facility, which he views as retaliation (exacted by nonparties) for his filing of this lawsuit; that he has come to believe the $750 settlement amount was too low; and that he intends to file a future lawsuit to address the retaliatory transfer: "I will address [the retaliatory transfer] in a separate lawsuit because I don't believe that your clients were directly involved, but I still feel that a $750 settlement is insufficient to resolve the harm your clients have caused me." (Doc. 59 at 7, 9.) In other words, due to a change of personal circumstance, Plaintiff no longer considers the terms of the agreement desirable and has changed his mind. But the very bedrock of contract law is the notion that once a binding agreement is formed, the parties to that agreement are held to the terms, even if a change in circumstances renders an agreement less favorable to one of the parties. *Rutland Marble Co. v. Ripley*, 77 U.S. 339, 357 (1870) ("[T]he question of the hardship of a contract is generally to be judged of at the time at which it is entered into; that if it be then fair and just, it will be immaterial that it may, by the force of subsequent circumstances or change of events, have become less beneficial to one party, except when these subsequent events have been in some way due to the party who seeks the performance of the contract.").

Under similar circumstances, one court upheld a settlement agreement over the plaintiff's objection that no enforceable agreement was reached because there was never a meeting of minds as to the scope of the anticipated release of claims. *Gregory v.*

*Zimmerman*, 2023 WL 2137406, *3 (N.D. Ind. 2023). The court concluded that the plaintiff's "change of heart appears to be based only on a late-blooming dissatisfaction with the amount of the settlement, which does not suffice to defeat the agreement previously reached." *Id.* at *3, 5. So too here. Indeed, in *Gregory*, at least there was some room for disagreement or confusion as to what the scope of the release might be: "A standard (and material) provision of virtually all litigation settlements is the dismissal with prejudice of the claims against the settling defendants, and I do not hesitate to find that such a standard release was understood to be part of the terms of settlement by both plaintiff Gregory and defendants Zimmerman, Lagunas, Maldonado, Florer and Beach. But, as Gregory now argues, there is no reason to believe that Gregory ever contemplated (or that defense counsel should have believed he did) releasing the $15,000 default judgment he had already obtained against defendant Woolfork and was seeking to enforce by various means, in exchange for a settlement of $8,000." *Id.* at *4. Here, the scope of the release could only be dismissal with prejudice of all claims against the Defendants in this action. There is no ambiguity as to the scope of the release, and indeed, Plaintiff identifies none.

II.    <u>Motion To Reinstate</u>

Having concluded that Defendants' motion to enforce should be granted, it goes without saying that Plaintiff's motion to reinstate is denied.

III.    <u>Conclusion</u>

The Court concludes that Defendants' motion to enforce the settlement should be granted in that this action will be dismissed with prejudice, as the binding settlement agreement between the parties resolves the claims in this action. However, to the extent Defendants request injunctive relief in the form of an order requiring Plaintiff to sign a release, that measure appears unnecessary. The dismissal with prejudice will preclude Plaintiff from bringing any future action against Defendants based on the claims asserted in this action.

Accordingly,

**IT IS ORDERED** that Defendants' motion to enforce settlement (Doc. 57) is

granted.

IT IS FURTHER ORDERED that Plaintiff's motion for reinstatement (Doc. 55) is denied.

IT IS FURTHER ORDERED that the Clerk of Court shall seal the exhibit at Doc. 57-1.

IT IS FURTHER ORDERED that this action is dismissed with prejudice. The Clerk of Court shall terminate the action.

Dated this 22nd day of December, 2025.

Dominic W. Lanza
United States District Judge